UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**DAWN BISHOP MCLIN, Ph.D.**

*Plaintiff,*

-vs.-  Case No. 3:25-cv-19-DPJ-ASH

**JACKSON STATE UNIVERSITY,
THE MISSISSIPPI BOARD OF TRUSTEES OF
STATE INSTITUTIONS OF HIGHER
LEARNING, and MARCUS L. THOMPSON, Ph.D.**

*Defendants.*

## COMPLAINT

Plaintiff Dawn Bishop McLin, Ph.D. ("Dr. McLin"), through counsel, files her complaint against Defendants set forth herein. Dr. McLin asserts the following claims arising out of the actionable misconduct of the Defendants. In support thereof, Dr. McLin alleges as follows:

### PARTIES

1. Dawn Bishop McLin, Ph.D., is a resident citizen of the State of Mississippi.

2. Jackson State University ("JSU") is an agency of the State of Mississippi. It may be served with process by service upon the Mississippi Attorney General and/or JSU's registered agent or General Counsel, Onetta Starling Whitley, Esq., or upon any person authorized to accept process on JSU, wherever such person may be found.

3. The Mississippi Board of Trustees of State Institutions of Higher Learning ("IHL") is an agency of the State of Mississippi. It may be served with process by service upon the Mississippi Attorney General and/or IHL's registered agent or the Commissioner of Higher Education, Dr. Alfred Rankins, Jr., or upon any person authorized to accept process on IHL,

wherever such person may be found.

4. Marcus L. Thompson, Ph.D., ("Dr. Thompson"), is a resident of the State of Mississippi, and may be served with process at JSU or wherever he may be found.

5. Dr. McLin sues Dr. Thompson in his individual capacity because Dr. Thompson committed the wrongful acts detailed in this complaint outside the course and scope of his employment. Consequently, Dr. McLin's claims are not subject to the Mississippi Tort Claims Act ("MTCA") and Dr. Thompson is not entitled to immunity under the MTCA. *See Jones v. Miss. Instit. of Higher Learning*, 264 So. 3d 9, 33 (Miss. Ct. App. 2018) (tort claims "may be brought against a governmental employee in his individual capacity, and the MTCA does not apply"); *see also id*. ("the MTCA does not apply to a claim for tortious interference with contract" and "[t]he MTCA and its various requirements, defenses, and exemptions do not apply to a claim properly filed against an individual employee in his individual capacity").

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

7. This Court has personal jurisdiction over JSU and the IHL because they are agencies of the State of Mississippi, and it has personal jurisdiction over Dr. Thompson because he is a citizen of the State of Mississippi.

8. Venue is proper in this district under 28 U.S.C. § 1391 because events, acts, or omissions giving rise to Dr. McLin's claims occurred in the Southern District of Mississippi and because as JSU, IHL, and Dr. Thompson reside in this district.

## FACTUAL ALLEGATIONS

**Dr. McLin's tenured role at JSU.**

9. Dr. McLin has a long and deep legacy with JSU. Her family and extended family attended JSU. She attended JSU. In 2004, Dr. McLin became a tenured-track professor at JSU. In 2010, Dr. McLin became an Associate Professor with tenure in JSU's psychology department. At the time of her wrongful termination, Dr. McLin was the only faculty member at the rank of Professor in the Department of Psychology.

10. As a tenured professor, Dr. McLin had a constitutionally protected property interest in her employment.

11. Dr. McLin was a highly accomplished and respected professor and member of JSU's faculty.

12. In addition to serving as a tenured professor of psychology, Dr. McLin took on other important and impactful roles. For example, she was selected by the IHL to serve on committees providing advice for JSU community listening sessions and presidential searches, which underscores her expertise, leadership, and commitment to JSU's governance and future. Dr. McLin also co-led JSU's Covid-19 Reopening Task Force. Dr. McLin's leadership in this initiative further highlights her steadfast dedication to JSU's mission, her ability to collaborate across departments, and her critical role in supporting JSU during an unprecedented and challenging time.

13. At the time of her wrongful termination, Dr. McLin was responsible for securing, researching and administered grants funded by the National Sciences Foundation, National Academies of Sciences, and United States Department of Homeland Security. Dr. McLin served as academic and research advisor to students at the undergraduate and graduate levels. She also served on graduate students' dissertations committees.

14. Moreover, Dr. McLin had for years served as the President of JSU's Faculty Senate, an important component of JSU's concept of shared governance. In this role, she heard and addressed concerns from other faculty members and communicated recommendations to JSU's administration based on the Faculty Senate's self-determination.

15. At times, Dr. McLin communicated decisions from the Faculty Senate that were unpopular or not well received – but that is the nature of her role, and that is a celebrated aspect of academia. Without academic freedom, universities—like JSU—cannot be laboratories for intellectual advancement.

16. On one occasion, Dr. McLin—in her capacity as President of the Faculty Senate—communicated a vote of "no confidence" for Professor Brandi Newkirk-Turner ("Dr. Newkirk-Turner"). This prompted Dr. Newkirk-Turner to seek revenge. Dr. Newkirk-Turner contacted members of Dr. McLin's family to complain about Dr. McLin and smear her reputation, and Dr. McLin notified JSU and Dr. Thompson of Dr. Newkirk-Turner's conduct.

17. Dr. Newkirk-Turner had an especially close relationship with Dr. Thompson and with Dr. Alfred Rankins, Jr. (the chair of IHL). Only hours after Dr. Newkirk-Turner was removed from her post in July of 2023 following the vote of "no confidence," Dr. Rankins personally directed that she be reinstated.

18. Emboldened by her relationship with Dr. Rankins, Dr. Newkirk-Turner then sought further retribution through Dr. Thompson.

19. Because of his close personal and familial relationship with Dr. Newkirk-Turner, and because he was personally offended and embarrassed because of the Faculty Senate's criticism

of JSU's Office of Academic Affairs two months after he assumed office, Dr. Thompson obliged.[1]

20.     Through JSU's Office of General Counsel, and under the leadership of Onetta Whitley, Dr. Thompson directed a sham investigation into Dr. McLin to find pretextual reasons to terminate her. The investigation was conducted, in whole or in part, by an outside attorney, Charles Winfield.

21.     The investigation revealed nothing of substance, and every reason Dr. Thompson later invoked to cause Dr. McLin's termination had occurred many months or years earlier – including conduct that occurred before Dr. Thompson became president of JSU.

22.     The "investigation" allegedly revealed Dr. McLin had turned her back in protest on Dr. Newkirk-Turner while she was speaking – an act plainly protected by the First Amendment. It otherwise revealed vague and contrived transgressions such as copying too many people on emails, complaining about inconsequential matters (like Halloween decorations), or voicing other concerns – all of which were lawful exercises of Dr. McLin's First Amendment rights and basic tenets of academic freedom. Dr. Thompson has never sought to terminate any other tenured professor for such trivial conduct (most of which is either contrived or constitutionally protected), which further underscores the personal nature of his vendetta against Dr. McLin.

23.     Dr. McLin was never counseled or warned about any of these things (most of which had occurred in 2023 or before). Dr. McLin never received any progressive discipline or corrective action about these things. Moreover, JSU never reported any of these alleged infractions to IHL in

---

[1] Dr. Thompson also had a personal vendetta against Dr. McLin because, years earlier, he and Dr. Newkirk-Turner co-taught a doctoral-level course while he was a doctoral student. This was a violation of accreditation standards and academic protocol because Dr. Turner did not yet have a doctoral degree. The Faculty Senate—including Dr. McLin—reviewed and criticized this arrangement as jeopardizing JSU's compliance with Southern Association of Colleges and Schools Commission on Colleges' ("SACSOC") accreditation standards.

the form of a Post-Tenure Review, which JSU was required to submit to IHL annually on or before July 15. Dr. McLin did not receive an annual evaluation.

24. To further underscore the contrived nature of Dr. Thompson's sham investigation, JSU renewed Dr. McLin's tenured faculty contract in July 2024 (just weeks before Dr. Thompson terminated her). That month, JSU also selected Dr. McLin to serve as a Title IX adjudicator, which confirms the confidence and trust JSU reposed in Dr. McLin.

25. But on August 1, 2024—without any warning, prior counseling, or corrective action, and despite its renewal weeks earlier of Dr. McLin's employment contract—Dr. Thompson delivered to Dr. McLin a letter indicating he intended to terminate her employment. *See* Ltr. from Dr. Thompson to Dr. McLin (Aug. 1, 2024), attached as **Exhibit 1**.

26. As alleged above and below, Dr. Thompson's "reasons" for Dr. McLin's termination were false, contrived, pretextual, and/or related to Dr. McLin's exercise of her constitutional rights.

27. Effective immediately, Dr. Thompson removed Dr. McLin from her professorial and other leadership duties, reassigned her grants (for which she was paid), and essentially eradicated her from JSU.

28. Dr. McLin timely requested a hearing, but JSU did not respond to Dr. McLin's hearing request until over six weeks had elapsed since Dr. Thompson delivered his termination letter. And when it did, JSU gave Dr. McLin only 10 days to prepare for a hearing on September 20, 2024 (and even then, Dr. McLin lacked access to her JSU email account and intranet resources, which impaired her ability to support her defense). JSU also gave Dr. McLin *only three days* to produce her witness and exhibit list. On the other hand, JSU *never produced* an exhibit or witness list to Dr. McLin.

29. Due to the death of a member of the Faculty Personnel Committee ("FPC"), the body responsible for determining the validity of Dr. Thompson's termination of Dr. McLin, the hearing was rescheduled to October 25, 2024.

30. In advance of the hearing, Dr. McLin requested: (i) her employment contracts as a tenured professor; (ii) JSU's Post-Tenure Reviews of Dr. McLin; (iii) Dr. McLin's personnel file; and (iv) JSU's investigative file of Dr. McLin. She informed JSU this information was necessary and relevant to the preparation of her defense. JSU refused to provide any of the information.

31. In advance of the hearing—as JSU had required her to do—Dr. McLin submitted her witness and exhibit list. She also responded to each of the allegations against her which were either impermissibly vague or involved constitutionally protected conduct. She also objected to the lack of procedural and substantive due process.

32. Dr. Thompson's and JSU's illegal treatment of Dr. McLin, meanwhile, had drawn the attention of others outside of JSU's orbit. For example, on October 24, 2024, the Foundation for Individual Rights and Expression ("FIRE") sent a letter to Dr. Thompson.

33. Among other things, FIRE expressed concern over "JSU's disciplinary charges against tenured professor and Faculty Senate President Dawn McLin for criticizing her colleagues and JSU. The First Amendment protects the expression of state university professors even when that expression is perceived as uncivil." *See* Ltr. from FIRE to M. Thompson (Oct. 24, 2024), attached as **Exhibit 2**. FIRE expressed particular concern because JSU was punishing Dr. McLin because she "harshly criticized JSU employees, questioned university leadership, and frequently complained about JSU policies and practices." *Id*.

34. Likewise, the American Association of University Professors ("AAUP") expressed concern over JSU's and Dr. Thompson's mistreatment of Dr. McLin. In the preceding months,

AAUP has sent three letters to Dr. Thompson regarding his mistreatment of Dr. McLin. Most recently, on January 8, 2025, the AAUP informed Dr. Thompson that his termination of Dr. McLin plainly violated her right to academic freedom. The AAUP also informed Dr. Thompson that his refusal to reinstate Dr. McLin (as the FPC recommended, see infra) also violated her rights. The AAUP described Dr. Thompson's treatment of Dr. McLin—which has left her "in a state of professional limbo with no discernible prospect of being returned to her faculty duties and denied access to her $1.5 million dollar grant"—as "extremely disturbing." *See* Ltrs. from AAUP to M. Thompson, attached as **Composite Exhibit 3**.

35.     On October 25, 2024, the FPC held Dr. McLin's termination hearing (the "Hearing"). From the start, JSU and Dr. Thompson attempted to frustrate Dr. McLin's ability to prepare a defense. They forced her to disclose her witness list in advance, even though JSU never disclosed a witness list.

36.     They forced Dr. McLin to put her defensive case on first—essentially, forcing her to defend and rebut evidence that she could only guess might be used against her—and then it adjourned the Hearing for several days so it could prepare its case.

37.     They forbid Dr. McLin's lawyer from advocating or arguing on her behalf, questioning witnesses, or commenting on the law or evidence. In other words, although Dr. McLin's lawyer was permitted to be physically present at the Hearing, he was not permitted to speak or participate.

38.     However, JSU and Dr. Thompson appeared through a lawyer, Charles Winfield. He was the *only* representative present for JSU and Dr. Thompson. Mr. Winfield cross-examined Dr. McLin's witnesses, objected to evidence, and advocated on JSU's behalf. In other words, Mr. Winfield functioned as both JSU's and Dr. Thompson's trial lawyer and as their official

representative (even though he is not an employee of JSU or IHL). This disparity in procedures shocks the conscience and patently deprived Dr. McLin of procedural due process.

39. After Dr. McLin presented her evidence and witnesses and argued on her own behalf, the Hearing adjourned so JSU and Dr. Thompson could prepare the presentation of their offensive case against Dr. McLin.

40. Days later, the Hearing reconvened. The night before the Hearing reconvened, JSU and Dr. Thompson announced they did not intend to call any witnesses. Instead, Mr. Winfield summarized the "case" Dr. Thompson had built against Dr. McLin.

41. Mr. Winfield's summary of Dr. Thompson's case included accusations and allegations made by JSU employees who were not present. Thus, Dr. McLin could not cross-examine them or otherwise confront her accusers.

42. This was, of course, Dr. Thompson's and JSU's design. They did not want Dr. McLin to interview these "accusers" in advance and they did not want her to question them at the Hearing. And by this time, Dr. Thompson and JSU had effectively shuttered Dr. McLin out of JSU for many months.

43. JSU and Dr. Thompson forced Dr. McLin to disclose her case in advance and put her case on first, without the aid of a lawyer. Then, JSU and Dr. Thompson—having had days to consider and analyze Dr. McLin's case—did not produce any witnesses against Dr. McLin, and simply presented its case through the advocacy of its own lawyer.

44. On November 20, 2024, the FPC published its findings and communicated these findings to Dr. Thompson. In relevant part, the FPC summarized Dr. McLin's case as follows:

    (i) JSU did not "provide substantive evidence to support such claims of malfeasance, inefficiency, contumacious conduct, and other cause."

(ii) Dr. Thompson's "recommendation for termination runs afoul of any termination processes which include progressive disciplinary actions and is not aligned with [Dr. McLin's] performance records."

(iii) Dr. Thompson's "arbitrary violation of substantive and procedural due process is a pattern which has impacted other faculty at JSU."

(iv) Dr. Thompson's termination of Dr. McLin was an "arbitrary deprivation of [Dr. McLin's] 20-year academic career…."

(v) Dr. Thompson's "recommendation for termination is retaliatory in nature, ultimately promoted by [Dr. Newkirk-Turner], and moved along by a 'fact finding mission' initiated by IHL."

(vi) "Had JSU's motivations for terminating Dr. McLin's employment been pure, it would not have renewed her contract, it would not have requested she serve as a Title IX adjudicator mere weeks before attempting to terminate her, and she would not have been personally sought out by the President to carry out tasks."

45. The FPC determined Dr. McLin "met her contention"—*i.e.*, she proved the theories illustrated above. *See id*. The FPC also noted that Mr. Winfield—who at the eleventh hour informed the FPC that he would call not witnesses at the Hearing—conducted the pre-Hearing investigation into Dr. McLin "at the behest of IHL." *See id.*

46. The FPC noted correctly that JSU and Dr. Thompson "ultimately [bore] the burden of demonstrating valid grounds" for terminating Dr. McLin, and it determined they had not met that burden. *See id.*

47. The FPC recommended "that the termination process conclude and that Dr. McLin should be immediately reinstated as a full professor, with her suspension rescinded and her rights

10

as a tenured faculty member fully restored" and "that Dr. McLin's due process rights be fully upheld as requested." *See id.*

48. Despite having had the FPC's report for more than 50 days, neither Dr. Thompson nor JSU have acted on it – despite Dr. McLin's and the AAUP's inquiries and requests that they do. Again, this is by design. By intentionally failing to act on the FPC's report—under which there can be only one outcome, "immediate reinstatement"—Dr. Thompson and JSU have left Dr. McLin in an unconscionable state of professional limbo.

49. Their intentional delay prevents Dr. McLin's reinstatement and continued oversight of her research grants while, at the same time, rendering it impossible for Dr. McLin to pursue alternative employment in academia. Dr. Thompson and JSU, by failing to act within a reasonable time (as their own policies require), are trying to force Dr. McLin to simply resign.

50. Dr. Thompson's and JSU's deliberate inaction, which follows their and IHL's pretextual and illegal termination of Dr. McLin, is further evidence of their willingness to violate Dr. McLin's constitutional rights, breach (or cause the breach of) her employment contract, and otherwise cause her economic and reputational harm.

### COUNT I:  Breach of Contract
### (JSU and IHL)

51. Dr. McLin incorporates the allegations set forth in previous paragraphs as if fully set forth herein.

52. Dr. McLin had a contract as "Professor Tenured in the Department of Psychology, College of Liberal Arts at [JSU]." JSU and IHL were both parties to the contract, which expressly stated the "Employment Contract" binds "The Mississippi Board of Trustees of State Institutions of Higher Learning…[and] Jackson State University."

53. The contract provided—just as the IHL By-laws mandate—that Dr. McLin could be terminated only for financial exigencies, reductions in programs or units, malfeasance, inefficiency or contumacious conduct, or other cause. In other words, JSU and IHL could not and cannot terminate Dr. McLin for political reasons, for convenience, or for any other reason not expressly stated in IHL's By-laws or in Mississippi statutes.

54. JSU and/or IHL breached the contract by terminating Dr. McLin without valid reasons. As a corollary, JSU and/or IHL also caused the reassignment of Dr. McLin's research grants, which deprived her of other income to which she was entitled.

55. JSU's and/or IHL's breach of Dr. McLin's contract proximately caused her damages, including: foreseeable injury to her professional reputation in academia, the loss of research grant monies, and related economic injury to be proven at trial.

### COUNT II: Violation of Constitutional Rights (Procedural Due Process)
### (JSU, IHL, and Marcus Thompson)

56. Dr. McLin incorporates the allegations set forth in previous paragraphs as if fully set forth herein.

57. "The protections of the Due Process Clause, whether procedural or substantive,…apply to deprivations of constitutionally protected property…interests." *Klingler v. Univ. S. Miss.*, 612 F. App'x 222, 227 (5th Cir. 2015). Tenured faculty have a constitutionally protected property interest in their continued employment. *Suddith v. Univ. S. Miss.*, 977 So. 2d 1158, 1170 (Miss. Ct. App. 2007) (collecting cases); *see also Jones v. La. Bd. Supervisors of Univ. of La. Sys.*, 809 F.3d 231, 237 (5th Cir. 2015).

58. "Where a tenured public university faculty member is terminated, due process requires both notice and an opportunity to be heard." *Jones v. La. Bd. Supervisors of Univ. of La. Sys.*, 809 F.3d 231, 236 (5th Cir. 2015). "The type of hearing necessary—the process due—is a

function of the context of the individual case." *Id*. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation and quotation omitted).

59.  JSU and Dr. Thompson violated Dr. McLin's constitutional right to procedural due process in several ways.

60.  First, they prohibited her from having her attorney advocate on her behalf or otherwise participate during the Hearing. On the other hand, JSU and Dr. Thompson prosecuted its case exclusively through an attorney, Mr. Winfield, who was not an employee of JSU. In other words, JSU and Dr. Thompson enjoyed the right to use an attorney while, at the same time, denying Dr. McLin that basic right.

61.  Second, after the FPC returned its decision and recommended Dr. McLin's immediate reinstatement, neither JSU nor Dr. Thompson acted on that recommendation – even after Dr. McLin and the AAUP requested they act. Instead, JSU and Dr. Thompson—for nearly two months after the FPC's recommendation—have taken no action, leaving Dr. McLin with no recourse and depriving her of her professorship and research grants.

62.  Third, JSU and Dr. Thompson violated their own policies (including policies approved and disseminated by Dr. Thompson himself) in terminating Dr. McLin and in the method in which they terminated her. They violated their policies in the following ways:

(i)  The policy states "[w]hen an employee is suspended or placed on leave pending the results of an investigation, the investigation must move forward as quickly as is practically possible under the circumstances." However, JSU and Dr. Thompson have intentionally delayed and caused Dr. McLin to languish since Dr. Thompson first announced his intention to recommend her termination in early August 2024.

(ii) The policy specifically contemplates progressive discipline to avoid termination. However, Dr. McLin never received any form of progressive discipline, counseling, warning, or any other form of corrective action. To the contrary, JSU renewed Dr. McLin's tenured employment just weeks before Dr. Thompson's notice of termination (which relied on alleged infractions that occurred many months and years prior to Dr. McLin's renewed employment).

63. Fourth, despite forcing Dr. McLin to disclose her witnesses in advance of the Hearing, JSU and Dr. Thompson refused to disclose theirs. In fact, JSU and Dr. Thompson forced Dr. McLin to present her defensive case without knowing what evidence or witnesses JSU would rely on to support Dr. Thompson's recommendation to terminate her. After Dr. McLin presented her case, JSU and Dr. Thompson *did not produce any witnesses*. They instead prosecuted their case only through summary argument of a lawyer, Mr. Winfield, who was not employed by JSU or IHL. This confirms the Hearing was a complete sham.

64. As admitted by Mr. Winfield at the Hearing, and as the FPC found, this campaign to eradicate Dr. McLin was done "at the behest of IHL." Thus, IHL directed, caused, and ratified these violations of Dr. McLin's constitutional rights.

65. The violations of Dr. McLin's constitutional right to procedural due process have proximately caused her injuries and damages.

**COUNT III:  Violation of Constitutional Rights (Substantive Due Process)**
**(JSU & Marcus Thompson)**

66. Dr. McLin incorporates the allegations set forth in previous paragraphs as if fully set forth herein.

67. "The protections of the Due Process Clause, whether procedural or substantive,…apply to deprivations of constitutionally protected property…interests." *Klingler v. Univ. S. Miss.*, 612 F. App'x 222, 227 (5th Cir. 2015). Tenured faculty have a constitutionally

protected property interest in their continued employment. *Suddith v. Univ. S. Miss.*, 977 So. 2d 1158, 1170 (Miss. Ct. App. 2007) (collecting cases); *see also Jones v. La. Bd. Supervisors of Univ. of La. Sys.*, 809 F.3d 231, 237 (5th Cir. 2015).

68. "Public officials violate substantive due process rights if they act arbitrarily or capriciously." *Edionwe v. Bailey*, 860 F.3d 287, 293 (5th Cir. 2017).

69. JSU and Dr. Thompson acted arbitrarily and capriciously in terminating Dr. McLin's tenured professorship and her research grants.

70. Some of Dr. Thompson's professed reasons for the termination includes conduct that is plainly protected under the First Amendment (*i.e.*, turning her back in protest of a speaker). The remaining reasons were vague, contrived, and unsubstantiated – just as the FPC determined. Stated another way, JSU and Dr. Thompson did not (and could not) prove any violation, infraction, or other conduct that justified (or even arguably supported) Dr. McLin's termination.

71. Dr. McLin's termination was carried out for "political reasons," which is arbitrary and capricious and which is expressly prohibited by IHL By-law 301.04(C).

72. As admitted by Mr. Winfield at the Hearing, and as the FPC found, this campaign to eradicate Dr. McLin was done "at the behest of IHL." Thus, IHL directed, caused, and ratified these violations of Dr. McLin's constitutional rights.

73. The violations of Dr. McLin's constitutional right to substantive due process have proximately caused her injuries and damages.

### COUNT IV: Tortious Interference with Contract
### (Marcus Thompson)

74. Dr. McLin incorporates the allegations set forth in previous paragraphs as if fully set forth herein.

75. Dr. Thompson was aware of the contract between Dr. McLin and JSU and IHL.

15

76. Dr. Thompson intentionally caused JSU and IHL to breach that contract by terminating Dr. McLin's employment or otherwise interfering with Dr. McLin's rights under that contract. Because Dr. Thompson's willful and malicious conduct was personally vindictive, he operated outside the course and scope of his employment and is not entitled to MTCA immunity.

77. Dr. Thompson interfered with Dr. McLin's contract by, *inter alia*, causing her termination for political and/or personal reasons; causing the violations of her right to constitutional due process; and removing and reassigning her research grants.

78. Dr. Thompson's interference with Dr. McLin's contract was malicious, willful, and designed to cause her foreseeable harm, including harm to her professional reputation in academia.

79. Dr. Thompson's interference with Dr. McLin's contract was the proximate cause of her injuries and damages.

### COUNT V: Tortious Interference with Business Expectancies
### (Marcus Thompson)

80. Dr. McLin incorporates the allegations set forth in previous paragraphs as if fully set forth herein.

81. Dr. Thompson knew Dr. McLin had secured numerous research grants from the National Sciences Foundation, National Academies of Sciences, and United States Department of Homeland Security. Dr. Thompson knew Dr. McLin administered those grants and was compensated for the administration of those grants.

82. Dr. Thompson caused Dr. McLin's grants to be reassigned elsewhere at JSU, which deprived Dr. McLin of income associated with those grants. In addition, that reassignment foreseeably and predictably had the collateral effect of preventing Dr. McLin from obtaining other grants.

83. Dr. Thompson's interference with Dr. McLin's grants—*i.e.*, her business expectancies—was willful, malicious, and designed to cause her foreseeable harm, including harm to her professional standing with agencies and entities responsible for awarding grants to professors in academia. Because Dr. Thompson's willful and malicious conduct was personally vindictive, he operated outside the course and scope of his employment and is not entitled to MTCA immunity.

84. Dr. Thompson's interference with Dr. McLin's business expectancies was the proximate cause of her injuries and damages.

### COUNT VI:  Intentional Infliction of Emotional Distress
### (Marcus Thompson)

85. Dr. McLin incorporates the allegations set forth in previous paragraphs as if fully set forth herein.

86. Dr. Thompson's conduct toward Dr. McLin was willful, malicious, and designed to inflict maximum personal and professional injury.

87. Dr. Thompson's conduct is utterly intolerable in any civilized society—particularly in academia, where tenured professors should not be targeted for personal or political reasons.

88. Dr. Thompson's conduct was intended to cause, and it did cause, Dr. McLin to suffer severe emotional distress associated with the loss of her tenured professorship, the loss of her research grants, and the permanent damage to her reputation in academia. Because Dr. Thompson's willful and malicious conduct was personally vindictive, he operated outside the course and scope of his employment and is not entitled to MTCA immunity.

89. Dr. Thompson has caused Dr. McLin to suffer anxiety, worry, sleeplessness, and other symptoms associated with his intentional and malicious conduct.

## DAMAGES

90. Dr. McLin incorporates the foregoing allegations as if fully set forth herein.

91. As a direct and proximate result of the actions of the defendants, as described herein and to be established at trial, Dr. McLin has been damaged and is entitled to relief as follows:

(a) Actual damages in an amount to be determined by a jury, including for the loss of salary, loss of research grants, and related economic injuries;

(b) Loss of goodwill and reputation in an amount to be determined by a jury;

(c) Consequential financial damages in an amount to be determined by a jury because of Dr. McLin's inability to compete for other employment and the loss of her research grants or grants that might have been awarded;

(d) Damages in an amount to be determined by a jury to compensate for emotional and mental distress associated with the untoward behavior and injuries inflicted;

(e) Other incidental and consequential damages;

(f) Prejudgment and post-judgment interest;

(g) Punitive damages, attorney's fees and case expenses, including costs of filing suit;

(h) Such further general or specific relief to which Dr. McLin is entitled at law or in equity; and

(i) Any additional relief and damages permitted by law and/or deemed just and proper by this Court.

## JURY DEMAND

92. Dr. McLin demands a jury trial.

**CONCLUSION AND PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Dawn Bishop McLin, Ph.D., respectfully requests that this Court grant her relief, as follows:

(a)     enter judgment in her favor on all counts and award her all relief to which she may be entitled; and

(b)     Award Dr. McLin any other legal or equitable relief to which she may be entitled.

Dated: January 10, 2025

                                          Respectfully submitted,

                                          **DAWN BISHOP MCLIN, PH.D.**

                                        By:    */s/ Chadwick M. Welch*
                                                      Chadwick M. Welch (MSB No. 105588)

                                                      *Her attorney*

OF COUNSEL:

Heidelberg Patterson Welch Wright
368 Highland Colony Parkway
Ridgeland, Mississippi 39157
Tel. 601.790.1588
Fax 601.707.3075
cwelch@hpwlawgroup.com